UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------x

TZVI KLEIN, on behalf of himself and all others
similarly situated,

                       Plaintiff,

       v.

PHYTON TALENT ADVISORS LLC and
SOCIETE GENERALE AMERICAS,

                       Defendants.

---------------------------------------------------------------x

Case No.

COLLECTIVE ACTION
COMPLAINT

DEMAND FOR JURY TRIAL

Plaintiff Tzvi Klein alleges as follows:

## JURISDICTION AND VENUE

1.    This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA").  This Court has supplemental jurisdiction over the New Jersey state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.    This Court also has diversity jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332, as Plaintiff is a resident of New Jersey and Defendants are residents of New York and/or Delaware, and the value of Plaintiff's claims exceeds $75,000.

3.    Venue is proper in this District because Defendants conduct business in this district and all events alleged herein took place in this District.

## PARTIES

4.    Defendant Phyton Talent Advisors, LLC ("Phyton") is a New York company with its principal place of business in downtown Manhattan.  Phyton Talent is a talent recruitment

agency that provides recruiting and payroll services to companies including Societe Generale.  At the time of Plaintiff's hire, Phyton operated under the trade name "Linium," which it changed to Phyton in or about late 2018.

5. Defendant Societe Generale Americas ("SG" or "SocGen") is a Delaware corporation headquartered in Manhattan.  Upon information and belief, SocGen manages the American affairs of the multinational French bank Societe Generale.

6. Plaintiff Tzvi Klein ("Plaintiff") worked for Defendants at SocGen as a subject matter expert in negative news from June 2017 until the end of 2020.

## COLLECTIVE ACTION ALLEGATIONS

7. Plaintiff brings the federal law causes of action on behalf of himself and all other similarly situated individuals who worked as consultants for SocGen on or after the date that is three years before the filing of this complaint and were paid through third parties on "daily rates" (the "FLSA Collective Plaintiffs").

8. Plaintiff is an appropriate representative of this collective action under 29 U.S.C. § 216(b).

9. Plaintiff and the other FLSA Collective Plaintiffs are similarly situated in that they are all subject to Defendants' common plan or practice of paying them daily rates with no overtime premiums.  Defendants routinely required and require these employees to work weekly hours in excess of forty but did not pay them overtime compensation at time and one-half their regular rate.

## FACTS

10. In or about June 2017, Plaintiff was recruited by Linium, now Phyton, for a position as KYC QA Analyst (Know Your Customer Quality Assurance Analyst) at SocGen.

11.     Plaintiff's titles and duties varied somewhat over the years.   However, throughout his employment, his primary job duty was to review negative news—culled through software referred to as DDIQ—about SocGen's clients to detect possible money laundering and/or other illegal activity.

12.     Banks are required have the necessary controls in place and provide the requisite notices to law enforcement to deter and detect money laundering, terrorist financing and other criminal acts under the federal Bank Secrecy Act (BSA) and Anti-Money Laundering Act (AMLA).   Plaintiff's work was part of this process.

13.     At all relevant times, Plaintiff was jointly employed by Phyton and SocGen.

14.     Plaintiff worked under an annually renewing contract between SocGen and Phyton/Linium that explicitly stated that Plaintiff was an employee of Phyton.

15.     Per the contract, SocGen had control of Plaintiff's hours of work.

16.     SocGen exercised this authority and told Plaintiff what his required hours of work were.

17.     Plaintiff worked almost exclusively at SocGen's Jersey City location until the COVID pandemic began, then started working from home in Lakewood, NJ.

18.     Plaintiff worked side by side with SocGen employees and under the direct supervision of SocGen managerial employees.

19.     Plaintiff had a desk at SocGen's office, where he was expected to and did in fact work.

20.     SocGen provided Plaintiff with a laptop/PC for his work.

21.     Plaintiff was given SocGen's Code of Conduct, which governed his conduct at work.

22.       SocGen had the right to terminate its relationship with Plaintiff by discontinuing Plaintiff's contract, which it in fact did at the end of 2020.

23.       Given the above, Plaintiff was an employee of both Phyton and SocGen at all relevant times.

## Wage and Hour Allegations

24.       Plaintiff typically worked at least 50 hours per week.

25.       Plaintiff worked 10 hours on a typical weekday, with the exception of some Fridays in the winter, and often worked on Sundays.

26.       Defendants paid Plaintiff $700 per day.

27.       Even though Plaintiff routinely worked more than 40 hours per week, Defendants did not pay him one and a half times his regular rate for overtime hours worked.

28.       When Plaintiff initially contracted with Defendants, he was informed that the expected workday covered by the salary was an eight-hour workday.

29.       During the last three years, there were many other individuals hired through Phyton to work in Plaintiff's department at SocGen.  Like Plaintiff, these individuals worked significant overtime.  In fact, SocGen told Plaintiff several times that it expected him and the other people hired through Phyton to work 10 hours per workday.

30.       Upon information and belief, all individuals employed through Phyton were, like Plaintiff, paid a daily rate, without any additional premiums for overtime.

31.       Defendants committed the foregoing acts willfully.

## Discrimination Allegations

32.       Plaintiff is an Orthodox Jew, and this is apparent from his physical appearance. Specifically, he wears a yarmulke and a beard.

33.      During the period of Plaintiff's employment, roughly 30 to 40 individuals worked as consultants in SocGen's Know Your Customer-Review department through Phyton or similar agencies.

34.      About half of these individuals were subsequently promoted and hired directly by SocGen.  As such, they were entitled to all the benefits of regular SocGen employees, unlike Plaintiff, who was paid through Phyton and received the more limited benefits offered by Phyton.

35.      Throughout the time Plaintiff was employed by SocGen, there were 3 to 4 consultants who, like Plaintiff, were Orthodox Jews. None of these individuals were ultimately hired directly by SocGen.

36.      Plaintiff's performance at SocGen was stellar.  Plaintiff was never the subject of formal criticism relating to his work performance, and he gained a significant amount of expertise as a subject matter expert over the years at SocGen.

37.      In fact, Plaintiff was the senior member of a team of negative news reviewers at the end of 2019.  While SocGen at this point formally held Plaintiff out as the senior member of the team, it simply renewed his contract for 2020 but did not offer him any direct employment or a promotion in title.

38.      Given the high quality of Plaintiff's work and the increased reliance on him for substantive and supervisory work, SocGen's failure to extend Plaintiff an offer of direct employment and/or promotion in title, despite having done so for so many other consultants, was clearly discriminatory. SocGen extracted as much work as they could from the visibly Orthodox Jews on the team but did not allow them to join the ranks of the regular SocGen employees.

39.      In Plaintiff's case, for much of his employment, SocGen had Plaintiff work in a large room with no private space in a secluded non-windowed area, away from the mainstream,

regular SocGen staff. Plaintiff was by far the most senior employee working under these conditions.

## **Whistleblowing Allegations**

40.     During his employment, Plaintiff complained about several items that he noticed did not adhere to the requirements of SocGen's BSA and AMLA compliance program.

41.     Over the years of his employment, Plaintiff complained that SocGen's due diligence software ("DDIQ") automatically filtered out news information about SocGen's clients that should have been reviewed by SocGen reviewers.

42.     Specifically, SocGen set its DDIQ system to "auto-adjudicate" certain negative news items as "immaterial" because of "location mismatches."   However, the "mismatches" were extremely overbroad because SocGen's clients typically did business in many locations.  This overbreadth caused SocGen not to review/escalate large amounts of information it should have reviewed pursuant to the relevant federal statutes.

43.     Plaintiff complained about overbroad auto-adjudication to all of his supervisors at SocGen, including Matthew Sheinbrot (KYC Manager), Laura Marafetti (VP Head of KYC-Americas), John Berzitskiy (VP-Project Manager for DDIQ) and Ms. Marafetti's predecessor, Trevor Gunderson.   While each of them pretended to be concerned when Plaintiff addressed the issue, SocGen in fact did nothing to correct the overbroad auto-adjudication, and Plaintiff continued raising the issue with his managers until the end of his employment.

44.     Toward the end of Plaintiff's employment, Defendants became heavily reliant on individuals in Chennai, India for work on negative news reviewing.   In reviewing the work of the individuals in Chennai, Plaintiff noticed that they often failed to fully grasp the relevance of certain news items, presumably as a result of the density of the news content and the non-native

nature of those individuals' English comprehension.

45.     Plaintiff found this to be very concerning, as it too resulted in SocGen filtering out relevant news stories instead of properly reviewing/escalating them as required by the BSA and the AMLA, and in 2020 he raised this issue with Mr. Berzitskiy several times.

46.     In early 2020, SocGen formally had Plaintiff stop documenting his Quality Assurance findings and review of the Chennai office's work.  Defendants stated they were doing so because the issues that Plaintiff raised were too "sensitive."   Instead, Defendants had Level reviews documented by the Cehnnai office, the very office that Plaintiff complained failed to spot and escalate issues.

47.     On one occasion in 2020, Mr. Berzitskiy made clear his displeasure with Plaintiff raising this issue, saying, "Tzvi, you are always coming up with problems, we need you to find solutions."

48.     On a separate occasion in 2020, Mr. Berzitskiy, incorrectly believing Plaintiff had logged off a conference call, lamented to Plaintiff's coworker, "Tzvi is always coming up with problems."

49.     In November 2020, Plaintiff complained to Vardharam Mali, a colleague and Senior Manager for SocGen in Chennai, that SocGen was having workers in Chennai review and "close out" negative news matters relating to companies that may be violating sanctions laws, even though SocGen's policy was that only "Level 2" reviewers, who were in the U.S., were supposed to "close out" sanctions-related matters.

50.     On December 24, 2020, Plaintiff was informed on a call with Ms. Marafetti that SocGen would not renew his contract for 2021 because they were winding down the use of US consultants.  As a result, Plaintiff's employment with Defendants ended.

51.     SocGen's explanation does not add-up. Throughout Plaintiff's employment with Defendants, his team, "the negative news team," was relatively small with at most 6 US employees. At least three of these individuals, like Plaintiff, began working through third-party staffing agencies, but were subsequently offered regular permanent employment with SocGen.  These individuals are Mr. Berzitskiy, Francis Rosario and Igor Mendelevich.

52.     During 2020, the only 2 US individuals working on negative news were Mr. Berzitskiy and Plaintiff.   Thus the entire "offloading" of US consultants for negative news work involved terminating Plaintiff.

53.     Given Plaintiff's excellent work, evidenced by his moving up the ranks of responsibility during the duration of his employment, it is clear that Defendants terminated Plaintiff in retaliation for his complaints about inadequate monitoring under the BLSA and AMLA.

54.     This conduct violated the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19 ("NJCEPA").

55.     Defendants' discriminatory and retaliatory conduct caused Plaintiff significant lost income and emotional distress.

**FIRST CLAIM FOR RELIEF**
**(FLSA Overtime Violations – 29 U.S.C. § 207**
**Brought by Plaintiff on Behalf of Himself and the FLSA Collective Plaintiffs)**

56.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates by reference all previous paragraphs.

57.     Throughout the statute of limitations period covered by these claims, Plaintiff and the FLSA Collective Plaintiffs regularly worked in excess of forty (40) hours per workweek.

58.     Defendant did not pay Plaintiff and the FLSA Collective Plaintiffs one and a half times their regular rate(s) for hours worked in excess of 40 per week.

59.        Plaintiff, on behalf of himself and the FLSA Collective Plaintiffs, seeks damages in the amount of their respective unpaid compensation, liquidated (double) damages as provided by the FLSA for overtime wage violations, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (New Jersey Overtime Violations – N.J.A.C. § 12:56-6.1
### Brought by Plaintiff on Behalf of Himself and the FLSA Collective Plaintiffs)

60.        Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates by reference all previous paragraphs.

61.        Throughout the statute of limitations period covered by these claims, Plaintiff and the FLSA Collective Plaintiffs regularly worked in excess of forty (40) hours per workweek.

62.        Defendant did not pay Plaintiff and the FLSA Collective Plaintiffs one and a half times their regular rate(s) for hours worked in excess of 40 per week.

63.        Plaintiff, on behalf of himself and the FLSA Collective Plaintiffs, seeks damages in the amount of their respective unpaid compensation, liquidated damages, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### (Religious Discrimination – New Jersey Law
### Against Discrimination, N.J. Stat. Ann. § 10:5-12(l)
### Brought by Plaintiff Against SocGen)

64.        Plaintiff realleges and incorporates by reference all previous paragraphs.

65.        Defendants discriminated against Plaintiff on the basis of his religion, in violation of the LAD, N.J. Stat. Ann. § 10:5-12(l).

66.        Defendants' conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

67.     As a direct and proximate result of Defendants' illegal discrimination, Plaintiff has suffered and will continue to suffer harm and is entitled to all equitable and legal remedies available under the LAD including, but not limited to reinstatement, restoration of benefits, back pay, front pay, compensatory and punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
**(Whistleblower Retaliation – New Jersey Conscientious
Employee Protection Act, N.J. Stat. Ann. § 34:19
Brought by Plaintiff Against SocGen)**

68.     Plaintiff realleges and incorporates by reference all previous paragraphs.

69.     The New Jersey Conscientious Employee Protection Act ("CEPA") prohibits employers from taking "any retaliatory action against an employee because the employee . . . objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law . . . [or]; (2) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J. Stat. Ann. § 34:19-3(c).

70.     Plaintiff engaged in protected activity under CEPA when he complained to his superiors about failure to adhere to proper BSA and AMLA protocols.

71.     Defendants' termination of Plaintiff constitutes illegal retaliation for plaintiff's protected activity under CEPA.

72.     Defendants' conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

73.     As a direct and proximate result of Defendants' illegal retaliation, Plaintiff has suffered and will continue to suffer harm and is entitled to all equitable and legal remedies

available under the CEPA including, but not limited to reinstatement, restoration of benefits, back pay, front pay, compensatory and punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the FLSA Collective Plaintiffs, prays for relief as follows:

(A) Designation of this action as a collective action on behalf of the FLSA Collective Plaintiffs and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the FLSA opt-in class, apprising them of the pendency of this action, and permitting them to assert timely FLSA claims and state claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b);

(B) Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

(C) An award of damages, according to proof, including back pay, liquidated damages, front pay, compensatory damages, emotional distress damages, and punitive damages, to be paid by Defendants;

(D) Penalties available under applicable laws;

(E) Costs of action incurred herein, including expert fees;

(F) Attorneys' fees, including fees pursuant to 29 U.S.C. § 216 and other applicable statutes;

(G) Pre-judgment and post-judgment interest, as provided by law; and

(H) Such other and further legal and equitable relief as this Court deems necessary, just

and proper.


Dated: New York, New York        JOSEPH & KIRSCHENBAUM LLP
        June 4, 2021

                                 By: */s/ Lucas C. Buzzard*
                                 D. Maimon Kirschenbaum
                                 Lucas C. Buzzard
                                 32 Broadway, Suite 601
                                 New York, NY 10004
                                 212-688-5640
                                 212-981-9587 (fax)

                                 *Attorneys for Plaintiff and the putative FLSA*
                                 *Collective Members*


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to

which he has a right to jury trial.